1

2

3

4

5

6

7

8                  IN THE UNITED STATES DISTRICT COURT

9                FOR THE EASTERN DISTRICT OF CALIFORNIA

10   TERRI MARTIN,

11             Plaintiff,                No. 2:11-cv-0891 GGH

12        vs.

13   MICHAEL J. ASTRUE,                  ORDER
     Commissioner of
14   Social Security,

15             Defendant.

16   _____/

17              Plaintiff seeks judicial review of a final decision of the Commissioner of Social

18   Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB")

19   and Supplement Security Income ("SSI") under Titles II and XVI, respectively, of the Social

20   Security Act ("Act").  For the reasons that follow, plaintiff's motion for summary judgment is

21   granted, defendant's cross-motion for summary judgment is denied, this matter is remanded to

22   the Commissioner for payment of benefits, and judgment is entered for plaintiff pursuant to

23   sentence four of 42 U.S.C. § 405(g).

24   BACKGROUND

25              Plaintiff, born January 13, 1960, applied on January 10, 2008 and January 18,

26   2008 for DIB and SSI, respectively, alleging that she became disabled on January 5, 2008.  (Tr. at

1

1    18, 72-73, 136, 143.)  The disability onset date was later amended to May 1, 2007 at the hearing

2    level.  (Tr. at 18.)  Plaintiff contended that she was unable to work primarily due to repetitive

3    stress injury (carpal tunnel), adjustment disorder, arthritis, back problems, depression, stress, and

4    anxiety.  (Tr. at 165.)  Plaintiff's claims were denied initially and upon reconsideration.  (Tr. at

5    18, 72-73, 77-78.)  Thereafter, plaintiff requested a hearing before an administrative law judge

6    ("ALJ"), which was conducted on November 5, 2009 in San Rafael, California.  (Tr. at 33-71.)

7    At the hearing, plaintiff was represented by attorney Richard Whittaker and Stephen Davis, an

8    impartial vocational expert ("VE"), also testified at the hearing.  (Tr. at 33-71.)

9            Subsequently, in a decision dated November 13, 2009, ALJ John R. Price

10   determined that plaintiff was not disabled.  (Tr. at 18-28.)  The ALJ made the following findings

11   (citations to the Code of Federal Regulations omitted):[1]

12

13       [1]  Disability Insurance Benefits are paid to disabled persons who have contributed to the
     Social Security program.  42 U.S.C. § 401 et seq.  Supplemental Security Income is paid to
14   disabled persons with low income.  42 U.S.C. § 1382 et seq.  Both provisions define disability, in
     part, as an "inability to engage in any substantial gainful activity" due to "a medically
15   determinable physical or mental impairment. . . ."  42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A).
     A parallel five-step sequential evaluation governs eligibility for benefits under both programs.
16   See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S.
     137, 140-42, 107 S. Ct. 2287 (1987).  The following summarizes the sequential evaluation:
17           Step one:  Is the claimant engaging in substantial gainful
         activity?  If so, the claimant is found not disabled.  If not, proceed
18       to step two.
             Step two:  Does the claimant have a "severe" impairment?
19       If so, proceed to step three.  If not, then a finding of not disabled is
         appropriate.
20           Step three:  Does the claimant's impairment or combination
         of impairments meet or equal an impairment listed in 20 C.F.R., Pt.
21       404, Subpt. P, App.1?  If so, the claimant is automatically
         determined disabled.  If not, proceed to step four.
22           Step four:  Is the claimant capable of performing his past
         work?  If so, the claimant is not disabled.  If not, proceed to step
23       five.
             Step five:  Does the claimant have the residual functional
24       capacity to perform any other work?  If so, the claimant is not
         disabled.  If not, the claimant is disabled.
25   Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).
         The claimant bears the burden of proof in the first four steps of the sequential evaluation
26   process.  Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.  The Commissioner bears the

1.   The claimant meets the insured status requirements of the Social Security Act through September 30, 2011.

2.   The claimant has not engaged in substantial gainful activity since May 1, 2007, the amended alleged onset date.

3.   The claimant has the following severe impairments: degenerative disc disease, right carpal tunnel syndrome, fibromyalgia, and affective disorder diagnosed as depressive disorder.

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can occasionally climb, stoop, kneel, crouch, and crawl, occasionally use her dominant right upper extremity to perform fine manipulation, such as fingering, and gross manipulation, such as handling small objects.  The claimant should not engage in any typing or keyboarding activity and should not work around hazards such as dangerous heights and moving machinery.  She should not engage in complex tasks and she requires a sit-and-stand option every thirty minutes.

6.   The claimant is unable to perform any past relevant work.

7.   The claimant was born on January 13, 1960 and was forty-seven years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8.   The claimant has at least a high school education and is able to communicate in English.

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy

burden if the sequential evaluation process proceeds to step five.  Id.

1    that the claimant can perform.

2    11.    The claimant has not been under a disability, as defined in
            the Social Security Act, from May 1, 2007, through the date
3           of this decision.

4    (Tr. at 20-28.)  The ALJ's decision became the final decision of the Commissioner when the

5    Appeals Council denied plaintiff's request for review on February 22, 2011.  (Tr. at 1-6.)

6    ISSUES PRESENTED

7           Plaintiff's motion presents the following issues for review: (1) whether the ALJ

8    erred by finding that plaintiff did not equal any listed impairment at step three; (2) whether the

9    ALJ improperly evaluated the medical evidence in determining plaintiff's residual functional

10   capacity ("RFC"); (3) whether the ALJ improperly discredited plaintiff's testimony concerning

11   her symptoms and associated functional limitations; and (4) whether the hypothetical question

12   posed to the VE included all of plaintiff's limitations supported by substantial evidence.

13   LEGAL STANDARDS

14          The court reviews the Commissioner's decision to determine whether (1) it is

15   based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in

16   the record as a whole supports it.  Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999).

17   Substantial evidence is more than a mere scintilla, but less than a preponderance.  Connett v.

18   Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted).  It means "such relevant evidence

19   as a reasonable mind might accept as adequate to support a conclusion."  Orn v. Astrue, 495 F.3d

20   625, 630 (9th Cir. 2007), quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).  "The

21   ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and

22   resolving ambiguities."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations

23   omitted).  "The court will uphold the ALJ's conclusion when the evidence is susceptible to more

24   than one rational interpretation."  Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

25   \\\

26   \\\

1    ANALYSIS

2         (1) Whether the ALJ erred by finding that plaintiff did not equal any listed

3    impairment at step three

4         As noted above, the ALJ found that plaintiff had the following severe

5    impairments: fibromyalgia,[2] degenerative disc disease, right carpal tunnel syndrome, and an

6    affective disorder diagnosed as depressive disorder.  (Tr. at 20.)  At step three, the ALJ

7    concluded that plaintiff does not have an impairment or combination of impairments that meets

8    or medically equals a listed impairment.  (Tr. at 21.)  The ALJ correctly observed that

9    fibromyalgia is not a listed impairment and then performed a relatively detailed analysis

10   concluding that plaintiff fails to meet or equal Listing 1.04 (disorders of the spine); Listing 11.14

11   (peripheral neuropathy); and Listing 12.04 (affective disorders).  (Tr. at 21-22.)  However, while

12   conceding that she does not meet a listing, plaintiff asserts that the ALJ failed to properly

13   consider whether plaintiff's combined impairments equaled a listing.  See 20 C.F.R. §

14   404.1526(b)(3) ("If you have a combination of impairments, no one of which meets a listing...we

15   will compare your findings with those for closely analogous listed impairments.  If the findings

16   related to your impairments are at least of equal medical significance to those of a listed

17   impairment, we will find that your combination of impairments is medically equivalent to that

18   listing.")

19        The Ninth Circuit held that, "in determining whether a claimant equals a listing

20   under step three...the ALJ must explain adequately his evaluation of alternative tests and the

21   combined effects of the impairments."  Marcia v. Sullivan, 900 F.2d 172, 176 (9th Cir. 1990).

22   Here, the ALJ did not expressly set forth any analysis regarding whether plaintiff's combined

23

24        [2] As the Ninth Circuit recognized, fibromyalgia is "a rheumatic disease that causes
     inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and
     other tissue...Common symptoms...include chronic pain throughout the body, multiple tender
25   points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain
     and fatigue associated with this disease."  Benecke v. Barnhart, 379 F.3d 587, 589-90 (9th Cir.
26   2004).

5

1  impairments equaled a listing.  Nevertheless, the Ninth Circuit has also made clear that a

2  claimant must at least offer a theory with some supporting evidence that her combined

3  impairments equal a listed impairment.  See Lewis v. Apfel, 236 F.3d 503, 514 (9th Cir. 2001).

4          Here, plaintiff has offered no actual theory of how her combined impairments

5  equal a listing, nor did she cite any specific record evidence in support.  Plaintiff refers the court

6  to a brief her counsel submitted to the ALJ prior to the hearing, which purportedly raised the

7  issue of medical equivalence.  (Tr. at 211-14.)  However, it mostly consists of a general summary

8  of medical evidence as opposed to evidence that is particularly keyed to specific listing

9  requirements.  Furthermore, although plaintiff's counsel suggested that plaintiff's experience of

10  chronic pain could "enhance" her lower back impairment under Listing 1.04 (disorder of the

11  spine), "[a] finding of equivalence must be based on medical evidence only" and cannot be based

12  on plaintiff's own symptom testimony.  Lewis, 236 F.3d at 514; 20 C.F.R. § 404.1529(d)(3) ("we

13  will not substitute your allegations of pain or other symptoms for a missing or deficient sign or

14  laboratory finding to raise the severity of your impairment(s) to that of a listed impairment").

15  Additionally, none of plaintiff's treating or examining providers opined that plaintiff's combined

16  impairments medically equal a listing.  Finally, although plaintiff's counsel also suggested, in

17  conclusory fashion, that plaintiff's impairments could equal Listing 12.07 for somatoform

18  disorders, plaintiff entirely fails to point to any record evidence in support.

19          Accordingly, the ALJ did not err in concluding that plaintiff's combined

20  impairments did not equal a listed impairment.  To the extent that the ALJ erred in failing to

21  provide more detailed findings and analysis in this regard, the court finds that such error was

22  harmless on the record before it.  See Curry v. Sullivan, 925 F.2d 1127, 1129 (9th Cir.1990)

23  (harmless error analysis applicable in judicial review of social security cases).

24  \\\

25  \\\

26  \\\

1      (2) Whether the ALJ improperly evaluated the medical evidence in determining

2  plaintiff's RFC

3          Plaintiff next contends that the ALJ improperly rejected the opinion of her treating

4  physician Dr. Kevin Cheng and consultative examiner Dr. Shirley Wu regarding plaintiff's

5  functional limitations.

6          The weight given to medical opinions depends in part on whether they are

7  proffered by treating, examining, or non-examining professionals.  Holohan v. Massanari, 246

8  F.3d 1195, 1201-02 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).

9  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater

10  opportunity to know and observe the patient as an individual.  Id.; Smolen v. Chater, 80 F.3d

11  1273, 1285 (9th Cir. 1996).

12          To evaluate whether an ALJ properly rejected a medical opinion, in addition to

13  considering its source, the court considers whether (1) contradictory opinions are in the record;

14  and (2) clinical findings support the opinions.  An ALJ may reject an *uncontradicted* opinion of a

15  treating or examining medical professional only for *"clear and convincing"* reasons.  Lester, 81

16  F.3d at 830-31.  In contrast, a *contradicted* opinion of a treating or examining professional may

17  be rejected for *"specific and legitimate"* reasons.  Lester, 81 F.3d at 830.  While a treating

18  professional's opinion generally is accorded superior weight, if it is contradicted by a supported

19  examining professional's opinion (supported by different independent clinical findings), the ALJ

20  may resolve the conflict.  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing

21  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).  The regulations require the ALJ to

22  weigh the contradicted treating physician opinion, Edlund v. Massanari, 253 F.3d 1152, 1157

23  (9th Cir.2001),[3] except that the ALJ in any event need not give it any weight if it is conclusory

24

25          [3] The factors include: (1) length of the treatment relationship; (2) frequency of
examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis;
26  (5) consistency; and (6) specialization.  20 C.F.R. § 404.1527.

7

1   and supported by minimal clinical findings.  Meanel v. Apfel, 172 F.3d 1111, 1114 (9th

2   Cir.1999) (treating physician's conclusory, minimally supported opinion rejected); see also

3   Magallanes, 881 F.2d at 751.  The opinion of a non-examining professional, without other

4   evidence, is insufficient to reject the opinion of a treating or examining professional.  Lester, 81

5   F.3d at 831.

6           In this case, there is no dispute as to plaintiff's diagnoses of fibromyalgia,

7   degenerative disc disease/degenerative facet arthropathy, carpal tunnel syndrome, and depression.

8   Indeed, the ALJ found these to be severe impairments.  (Tr. at 20.)  Instead, the contradiction lies

9   between the various physicians' opinions regarding plaintiff's functional limitations resulting

10  from these impairments.

11          According to the medical records, plaintiff was first diagnosed with fibromyalgia

12  and carpal tunnel syndrome in the early to mid 1990s, but continued working for many years as a

13  paralegal until around May 1, 2007 when she felt that she was no longer able to continue with

14  that work due to pain; difficulty with typing, keyboarding, and prolonged sitting and standing;

15  and stress.  (Tr. at 40, 265, 268, 286-87, 342.)  She switched to doing some limited legal

16  transcribing work from home, but found that it caused her even greater pain due to sitting and

17  keyboarding for longer periods, and she ultimately stopped working entirely around early January

18  2008.  (Tr. at 40-42.)[4]

19          During 2007-2008, plaintiff was again diagnosed with fibromyalgia by both of her

20  primary care providers, Dr. Ramandip Mangat and Dr. Mary Minguito, as well as rheumatologist

21  Dr. Hui Pan, noting pain all over her body and tenderness at 13-14 trigger points (Tr. at 265-66,

22  268-69, 272-73, 338-39.)  November 5, 2007 x-rays of plaintiff's lumbar spine ordered by Dr.

23  Pan showed minimal degenerative disc disease, but moderate to marked degenerative facet

24  ————————————————

25      [4] The ALJ found that the legal transcribing work plaintiff performed after her alleged
    onset date of May 1, 2007 was part-time and did not rise to the level of substantial gainful
26  activity.  (Tr. at 20.)

1   disease from L4 through S1.  (Tr. at 263.)  After treatment with various medications, physical

2   therapy, water walking, home exercises, paraffin hand/wrist wax treatment, and the use of a

3   TENS unit,[3] Dr. Mangat referred plaintiff to Kaiser's chronic pain clinic on May 4, 2008.  (Tr. at

4   276-78, 283-84, 336, 423-24.)  On July 15, 2008, plaintiff was evaluated by Dr. Kevin Cheng

5   with Kaiser's chronic pain management program.  (Tr. at 342-44.)  Plaintiff described whole-

6   body pain with a range of 5-9 out of 10, which was worse at the end of the day and with stress,

7   and was helped a little by medication and by physical therapy.  (Tr. at 342.)  On physical

8   examination, Dr. Cheng found 14 out of 18 positive trigger points, decreased range of motion in

9   her back, and tenderness in her knees and forearms, although she had a normal gait and strength.

10   (Tr. at 343.)  He also diagnosed plaintiff with fibromyalgia and increased her medications.  (Tr.

11   at 343.)  Around that time, plaintiff started attending a pain management therapy group

12   associated with Kaiser's chronic pain program.  (Tr. at 408-18.)

13          On August 5, 2008, Dr. Minguito observed that plaintiff's pain was still not

14   controlled although she was hoping to return to work in the future, and a physical examination

15   revealed diffuse muscle tenderness, but no focal muscle weakness.  (Tr. at 345.)  Subsequently,

16   on December 19, 2008, Dr. Minguito noted that plaintiff continues to follow up at the chronic

17   pain clinic, but has reported gradual worsening of her symptoms over time, especially in her

18   upper extremities, neck, and back.  (Tr. at 405.)  Dr. Minguito stated that plaintiff had tried

19   several medications without much improvement – her medications helped alleviate her pain, but

20   also caused her drowsiness.  (Tr. at 405.)  A physical examination again revealed a normal gait,

21   but muscle tenderness at several trigger points.  (Tr. at 405.)

22          On November 14, 2008, Dr. Cheng completed a chronic pain residual functional

23   capacity questionnaire, identifying plaintiff's symptoms resulting from her fibromyalgia as

24

25          [3] "Transcutaneous electrical nerve stimulation (TENS), used to treat some types of
    chronic pain, sends pulses of battery-generated electrical current to key points on a nerve
    pathway via electrodes taped to your skin."  See

26   http://www.mayoclinic.com/health/medical/IM01523.

1  generalized pain in all four quadrants of the body, fatigue, and stress.  (Tr. at 384.)  He listed his

2  objective findings as trigger points, tenderness, impaired sleep, muscle spasms, sensory changes,

3  and reduced range of motion in the arms, hands, elbow, hips, and knees.  (Tr. at 384.)  He noted

4  that plaintiff experienced drowsiness and constipation as side effects of her medications.  (Tr. at

5  385.)  Dr. Cheng opined that plaintiff could walk 2-3 blocks without rest or severe pain; could sit

6  for 30 minutes at a time; could stand for 30 minutes at a time; could sit, stand, and walk for less

7  than two hours total in an eight-hour workday; and would need to lie down at unpredictable

8  intervals 2-3 times during an eight-hour workday.  (Tr. at 385-86.)  He further stated that plaintiff

9  could occasionally lift up to 10 pounds and rarely lift up to 20 pounds; could occasionally twist,

10  stoop/bend, and climb stairs, but rarely crouch/squat or climb ladders; and could use her arms,

11  hands, and fingers for reaching, grasping, turning, twisting, and fine manipulation about 25% of

12  an eight-hour workday.  (Tr. at 386.)  He also estimated that plaintiff would likely be absent from

13  work about four days per month as a result of her impairments and treatment of her impairments,

14  and opined that she could perform sedentary work for about 15 hours a week on a regular basis.

15  (Tr. at 387.)  Dr. Cheng indicated that plaintiff's impairments lasted or could be expected to last

16  at least 12 months.  (Tr. at 385.)

17          There can be little doubt that if Dr. Cheng's assessment were fully credited,

18  plaintiff would be disabled under the Act.  The ALJ discounted the relevant portion of Dr.

19  Cheng's opinion as follows:

20          Treating source Kevin Cheng, D.O., completed a medical source
          statement in November 2008 at the request of the claimant's
21          representative (Ex. 17F).  Dr. Cheng assessed that the claimant
          could engage in less than sedentary activity (Ex. 17F, pp. 3-6).
22          Reduced weight is given to Dr. Cheng's assessment in light of the
          claimant's overall and minimal treatment.  The record reflects that
23          the claimant has been treated for fibromyalgia symptoms but she
          has been seen on a limited basis and she has reported benefit from
24          therapy, medications and other conservative alternative modalities.
          She also continues to engage in a variety of activities that suggest
25          that she is not wholly disabled, as noted above.  While Dr. Cheng
          simply states that the claimant has generalized pain consistent with
26          fibromyalgia, his assessment report is not well-corroborated by

1    objective medical findings, as required by 20 CFR 404.1527(d)(2).
2    The treatment notes fail to document a persistent pattern of joint
     symptoms and she has exhibited full range of motion, normal gait
3    and no synovitis at times (Exhibits 2F, 10F, 18F).

4    (Tr. at 25-26.)

5            The ALJ's conclusion that plaintiff received "minimal" or "limited" treatment is

6    not supported by substantial evidence in the record as a whole.  As outlined above, plaintiff

7    sought treatment from two primary care providers, a rheumatologist, a chronic pain specialist,

8    and a physical therapist for her impairments and followed their prescribed treatment.  Although

9    the record did not contain extensive medical records from 2009 onwards, plaintiff testified that

10   she continued to do her home exercise therapy program (explaining that her physical therapist

11   indicated that there was not much more he could do other than check on her exercises), continued

12   to participate in chronic pain program classes, and continued to take her medications which

13   stabilized her pain limit sufficiently to allow her to get up and move around.  (Tr. at 43-45.)

14           Furthermore, although plaintiff did report some improvement with physical

15   therapy and medication, the medical records also show that plaintiff's medication often did not

16   sufficiently control her pain, and that her doctors were continuously switching and increasing her

17   medication to attempt to find therapeutic levels, which in turn caused significant side effects of

18   sleepiness and drowsiness.  (See e.g. tr. at 58-60, 273, 281, 338-39, 343, 345, 405, 421.)  At the

19   hearing she testified that the medications brought her pain down from about an 8.5 to 9 to about a

20   6 to 7 on a 10-point scale, but that the muscle relaxant she took about 3-4 times a day made her

21   sleep and rendered her unable to drive.  (Tr. at 45-47.)  As plaintiff put it: "If I take the

22   medication I can't do the work, if I don't take the medication I can't do the work, and so I don't

23   know how to fully describe it other than I cannot function at the level that I used to function at,

24   no matter how hard I try."  (Tr. at 61.)

25           Additionally, the ALJ suggested that plaintiff's level of activities also undermined

26   Dr. Cheng's opinion.  The ALJ stated that plaintiff was able to walk for exercise, garden, engage

11

1   in activities such as driving and running errands outside the house, visit with friends and check in

2   on her mother and another elderly woman, maintain her personal hygiene on a daily basis,

3   transport her child to school and back home, care for and play with her dog, prepare at least

4   simple meals, engage in housework, shop for clothes and groceries, and drive four to five days

5   per week.  (Tr. at 23-24.)

6          However, a careful review of the record reveals that the ALJ's summary

7   significantly overstated plaintiff's level of activity.  While plaintiff admitted to engaging in those

8   types of activities, they were typically undertaken at a slow pace with many breaks and did not

9   consume a substantial part of her day.  (Tr. at 51, 54-57.)  For example, she testified to trying to

10  do something every day, such as driving to the store or pharmacy to pick something up.  (Tr. at

11  56.)  Afternoons she helped her mother by going through mail, playing with and washing the dog,

12  and helped another elderly woman by combing her hair and spending time talking to her.  (Tr. at

13  55.)  Her gardening essentially involved watering a flower basket garden at her apartment.  (Tr. at

14  55-56.)  She also described limited walking to the park down the street and to the farmer's

15  market, and she was very proud of having walked one lap around the track at a Relay for Life

16  event.  (Tr. at 51.)  With respect to household chores, she stated:

17              The laundry, yeah I do, but I've found – and this is again part of
             what I've learned through chronic pain – is pacing it.  If I do one
18           load of laundry every four days as opposed to trying to do four
             loads in one day, I can get through a week.  So vacuuming, not
19           more than once a week because that is definitely pain.  Same with
             any type of sweeping.  Doing dishes – I do do the dishes but I drop
20           them a lot, break them.

21  (Tr. at 56.)  Although the ALJ observed that plaintiff described a "full range of daily activities"

22  to consultative examiner Dr. Wu, she actually informed Dr. Wu that while she was able to drive,

23  cook, vacuum, and do dishes at home, she required frequent breaks to finish the activities and

24  was not able to do yard work.  (Tr. at 24, 287.)  This is consistent with plaintiff's statement to

25  consulting psychologist Dr. Wendy McCray that she "must break tasks down into small segments

26  and complete them over time."  (Tr. at 297.)  Finally, even though the ALJ noted that plaintiff

12

1  had taken care of her father, mother, son, and stepsons to some extent in January 2007, this was

2  prior to the alleged disability onset date, plaintiff at that time told her therapist that she was

3  unable to continue doing it, and it was evident that plaintiff was not coping well.  (Tr. at 24, 259.)

4          The Ninth Circuit has "repeatedly asserted that the mere fact that a plaintiff has

5  carried on certain daily activities ... does not in any way detract from her credibility as to her

6  overall disability.  One does not need to be utterly incapacitated in order to be disabled."

7  Benecke, 379 F.3d at 594 (internal quotation omitted).  For this same reason, plaintiff's relatively

8  limited daily activities, undertaken with significant pacing and breaks, do not constitute a

9  legitimate reason to reject Dr. Cheng's assessment.

10          With respect to the ALJ's finding that Dr. Cheng's opinion is "not well-

11  corroborated by objective medical findings," the Ninth Circuit has recognized that although the

12  American College of Rheumatology issued a set of diagnostic criteria for fibromyalgia, "there are

13  no laboratory tests to confirm the diagnosis."  Benecke, 379 F.3d at 590.  Diagnosis of the

14  disease, along with an accurate assessment of associated functional limitations, is therefore

15  necessarily dependent on the clinical findings, expertise, and experience of the physician.

16  Although Dr. Cheng himself did not appear to examine and treat plaintiff extensively, the court

17  cannot say that his opinion is conclusory or minimally supported, and his diagnosis and

18  assessment are relatively consistent with the clinical findings of plaintiff's primary care

19  providers, Drs. Mangat and Minguito, and rheumatologist Dr. Pan.  Moreover, with special

20  expertise in chronic pain management, Dr. Cheng's opinion carries substantial weight.

21          Moreover, even if the court were to find that the relatively severe limitations

22  imposed by Dr. Cheng were not adequately supported by his clinical findings, the opinion of

23  consultative examiner Dr. Shirley Wu also suggests that plaintiff is disabled under the Act.  (Tr.

24  at 286-90.)  After a physical examination on April 26, 2008, Dr. Wu opined that plaintiff could

25  do light work, but that she would need to take breaks every hour for ten minutes to accommodate

26  fatigue and stiffness.  (Tr. at 289.)  The VE testified that such a limitation would prevent plaintiff

1    from obtaining substantial gainful employment.  (Tr. at 66.)  Even though the ALJ credited most

2    of Dr. Wu's opinion, he gave little weight to her assessment that plaintiff would require such

3    hourly breaks, indicating that it was not well supported and based on limited objective findings.

4    (Tr. at 24.)  Relying primarily on the opinions of non-examining state agency consultants, Drs.

5    Eskander and Sciara, the ALJ reasoned that "Dr. Wu's own physical examination of the claimant

6    was generally unremarkable and she observed adequate gait, normal motor function in the lower

7    extremities and negative straight leg raise."  (Tr. at 24-25, 291-95, 352-59.)

8            As an initial matter, the opinions of a non-examining professionals, without other

9    evidence, are insufficient to reject the opinion of a treating or examining professional.  Lester, 81

10   F.3d at 831.  Here, the ALJ relied on the opinions of the non-examining state agency consultants,

11   who offered no additional independent clinical findings, to reject pertinent portions of the

12   treating and examining physicians' assessments.  Furthermore, the fact that Dr. Wu's

13   examination revealed that plaintiff had a normal gait, normal motor function, mostly normal

14   range of motion, and was able to walk and sit without difficulty during the one-time examination

15   does not necessarily undermine plaintiff's persistent symptoms of pain, stiffness, and fatigue

16   associated with her fibromyalgia and other impairments.  It is also not surprising that plaintiff did

17   not have significant atrophy, given that she was maintaining some level of activity and exercises.

18   While defendant suggests that Dr. Wu relied entirely on plaintiff's subjective complaints in

19   formulating the hourly breaks limitation, Dr. Wu was the Commissioner's designated

20   consultative examiner and presumably had the requisite clinical expertise to properly assess

21   plaintiff's limitations based on her examination, clinical findings, and plaintiff's reported

22   symptoms.  Dr. Wu's finding that plaintiff would require regular breaks is also consistent with

23   treating physician Dr. Cheng's similar opinion.

24           For these reasons, the court finds that the ALJ failed to provide specific and

25   legitimate reasons to reject the opinions of Drs. Cheng and Wu and therefore improperly

26   evaluated the medical evidence in formulating plaintiff's RFC.

14

1          (3) Whether the ALJ improperly discredited plaintiff's testimony concerning her

2  symptoms and associated functional limitations

3          "Credibility determinations are the province of the ALJ" and are entitled to

4  deference if the ALJ provides sufficient reasoning supported by substantial evidence.  Fair v.

5  Bowen, 885 F.2d 597, 604 (9th Cir. 1989).  A two-step analysis is used to determine whether a

6  claimant's testimony regarding subjective pain or symptoms, and resulting functional limitations,

7  is credible.  First, the claimant "must produce objective medical evidence of an underlying

8  impairment which could reasonably be expected to produce the pain or other symptoms

9  alleged...."  Smolen, 80 F.3d at 1281 (citations omitted).  "[T]he claimant need not show that her

10  impairment could reasonably be expected to cause the severity of the symptom she has alleged;

11  she need only show that it could reasonably have caused some degree of the symptom."  Id. at

12  1282.  Second, once this initial showing is made and there is no affirmative evidence of

13  malingering, "the ALJ may reject the claimant's testimony regarding the severity of her

14  symptoms only if he makes specific findings stating clear and convincing reasons for doing so."

15  Id. at 1283-84; see also Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009).

16          "General findings are insufficient; rather, the ALJ must identify what testimony is

17  not credible and what evidence undermines the claimant's complaints."  Lester, 81 F.3d at 834;

18  see also Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  In weighing a claimant's

19  credibility, the ALJ may consider, among other factors, her reputation for truthfulness;

20  inconsistencies in her statements and testimony, or between her statements or testimony and her

21  conduct; her daily activities; her work record; unexplained or inadequately explained failure to

22  seek treatment or to follow a prescribed course of treatment; and testimony from physicians and

23  third parties concerning the nature, onset, duration, frequency, severity, and effect of the

24  symptoms of which she complains.  See Smolen, 80 F.3d at 1284.  However, the ALJ may not

25  find subjective complaints incredible solely because objective medical evidence does not

26  quantify them.  Bunnell v. Sullivan, 947 F.2d 341, 345-46 (9th Cir. 1991).

1          In this case, the ALJ primarily discredited plaintiff's testimony by referencing her

2    daily activities and supposedly effective treatment with physical therapy and medication.  (Tr. at

3    23-24.)  However, for the reasons discussed above, the ALJ's conclusions regarding plaintiff's

4    activity level and the efficacy of her treatment are not supported by substantial evidence in the

5    record as a whole and thus cannot serve as clear and convincing reasons for discounting

6    plaintiff's testimony.  Additionally, the fact that she was able to answer questions "without

7    difficulty or loss of concentration" during the course of a hearing that lasted less than an hour is

8    not by itself dispositive.  (Tr. at 24, 35, 70.)  Finally, the ALJ's observation that plaintiff

9    "continued to work as a paralegal for many years despite a history of discomfort due to

10   fibromyalgia, back pain, and carpal tunnel syndrome" is not a clear and convincing reason for

11   rejecting plaintiff's testimony.  As outlined above, there was significant medical evidence that

12   plaintiff's symptoms worsened over time.  Under such circumstances, a claimant should not be

13   penalized for attempting to work for as long as she was able.  In many cases, this point of

14   struggling over time despite a fibromyalgia diagnosis proves the claimed pain and symptoms

15   more than a suspicious, immediate change from doing well to completely unable to work.

16          Therefore, the court also concludes that the ALJ failed to provide specific, clear,

17   and convincing reasons for rejecting plaintiff's testimony regarding the severity of her symptoms

18   and associated limitations.

19              (4) Other Issues

20          In light of the ALJ's errors in evaluating the medical opinion evidence and

21   discounting plaintiff's testimony regarding the extent of her symptoms and functional limitations,

22   the court finds it unnecessary to reach plaintiff's remaining arguments.  The only issue is whether

23   the case should be remanded for additional evidence or an award of benefits.  Where the ALJ

24   fails to provide adequate reasons for rejecting the opinion of a treating physician, the opinion is

25   credited as a matter of law.  Lester, 81 F.3d at 834.  Similarly, where the ALJ improperly rejects

26   the claimant's testimony regarding her limitations and the claimant would be disabled if her

1  testimony were credited, that testimony is credited as a matter of law.  Id.   There appears to be a

2  split in Ninth Circuit authority as to whether the "credit as true" rule is mandatory or

3  discretionary.  Vasquez v. Astrue, 572 F.3d 586, 593 (9th Cir. 2009).

4         However, in this case, the court has little difficulty in concluding that the "credit

5  as true" rule should be applied and the case remanded for benefits.  An award of benefits is

6  appropriate where "no useful purpose would be served by further administrative proceedings"

7  and "the record has been thoroughly developed."  Varney v. Sec'y of Health & Human Servs.,

8  859 F.2d 1396, 1399 (9th Cir. 1988).  This is a recognition of the "need to expedite disability

9  claims."  Id. at 1401.  Here, the record has been fully developed and there is no need for an

10  additional consultative evaluation, clarification from plaintiff's treating physicians, or

11  supplemental VE testimony.  For the reasons discussed above, if the opinions of treating

12  physician Dr. Cheng and consultative examiner Dr. Wu were properly credited, plaintiff would

13  be found disabled under the Act.  Remand for an award of benefits, with a disability onset date of

14  May 1, 2007, is therefore appropriate.

15  CONCLUSION

16         Accordingly, for the reasons outlined above, IT IS HEREBY ORDERED that:

17         1.  Plaintiff's motion for summary judgment (dkt. no. 16) is GRANTED;

18         2.  Defendant's cross-motion for summary judgment (dkt. no. 18) is DENIED;

19         3.  The case is remanded to the Commissioner for payment of benefits; and

20         4.  Judgment is entered for plaintiff pursuant to sentence four of 42 U.S.C. §

21  405(g).

22  DATED: August 23, 2012

23

24                    /s/ Gregory G. Hollows
                UNITED STATES MAGISTRATE JUDGE

25

26  GGH/wvr
    Martin.891.ss.wpd