IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

TERRI MARTIN,

       Plaintiff,                    No. 2:11-cv-0891 GGH

    vs.

MICHAEL J. ASTRUE,              ORDER
Commissioner of
Social Security,

       Defendant.
_____/

       Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplement Security Income ("SSI") under Titles II and XVI, respectively, of the Social Security Act ("Act"). For the reasons that follow, plaintiff's motion for summary judgment is granted, defendant's cross-motion for summary judgment is denied, this matter is remanded to the Commissioner for payment of benefits, and judgment is entered for plaintiff pursuant to sentence four of 42 U.S.C. § 405(g).

BACKGROUND

       Plaintiff, born January 13, 1960, applied on January 10, 2008 and January 18, 2008 for DIB and SSI, respectively, alleging that she became disabled on January 5, 2008. (Tr. at

1

18, 72-73, 136, 143.) The disability onset date was later amended to May 1, 2007 at the hearing level. (Tr. at 18.) Plaintiff contended that she was unable to work primarily due to repetitive stress injury (carpal tunnel), adjustment disorder, arthritis, back problems, depression, stress, and anxiety. (Tr. at 165.) Plaintiff's claims were denied initially and upon reconsideration. (Tr. at 18, 72-73, 77-78.) Thereafter, plaintiff requested a hearing before an administrative law judge ("ALJ"), which was conducted on November 5, 2009 in San Rafael, California. (Tr. at 33-71.) At the hearing, plaintiff was represented by attorney Richard Whittaker and Stephen Davis, an impartial vocational expert ("VE"), also testified at the hearing. (Tr. at 33-71.)

Subsequently, in a decision dated November 13, 2009, ALJ John R. Price determined that plaintiff was not disabled. (Tr. at 18-28.) The ALJ made the following findings (citations to the Code of Federal Regulations omitted):[1]

---

[1] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program. 42 U.S.C. § 401 et seq. Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq. Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-42, 107 S. Ct. 2287 (1987). The following summarizes the sequential evaluation:

> Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
> Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
> Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
> Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
> Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process. Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5. The Commissioner bears the

2

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2011.

2. The claimant has not engaged in substantial gainful activity since May 1, 2007, the amended alleged onset date.

3. The claimant has the following severe impairments: degenerative disc disease, right carpal tunnel syndrome, fibromyalgia, and affective disorder diagnosed as depressive disorder.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can occasionally climb, stoop, kneel, crouch, and crawl, occasionally use her dominant right upper extremity to perform fine manipulation, such as fingering, and gross manipulation, such as handling small objects.  The claimant should not engage in any typing or keyboarding activity and should not work around hazards such as dangerous heights and moving machinery.  She should not engage in complex tasks and she requires a sit-and-stand option every thirty minutes.

6. The claimant is unable to perform any past relevant work.

7. The claimant was born on January 13, 1960 and was forty-seven years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8. The claimant has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy

---

burden if the sequential evaluation process proceeds to step five.  <u>Id</u>.

3

that the claimant can perform.

    11.     The claimant has not been under a disability, as defined in
            the Social Security Act, from May 1, 2007, through the date
            of this decision.

(Tr. at 20-28.) The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on February 22, 2011. (Tr. at 1-6.)

ISSUES PRESENTED

Plaintiff's motion presents the following issues for review: (1) whether the ALJ erred by finding that plaintiff did not equal any listed impairment at step three; (2) whether the ALJ improperly evaluated the medical evidence in determining plaintiff's residual functional capacity ("RFC"); (3) whether the ALJ improperly discredited plaintiff's testimony concerning her symptoms and associated functional limitations; and (4) whether the hypothetical question posed to the VE included all of plaintiff's limitations supported by substantial evidence.

LEGAL STANDARDS

The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it. Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999). Substantial evidence is more than a mere scintilla, but less than a preponderance. Connett v. Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted). It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007), quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

\\\

\\\

4

ANALYSIS

(1) Whether the ALJ erred by finding that plaintiff did not equal any listed impairment at step three

As noted above, the ALJ found that plaintiff had the following severe impairments: fibromyalgia,[2] degenerative disc disease, right carpal tunnel syndrome, and an affective disorder diagnosed as depressive disorder. (Tr. at 20.) At step three, the ALJ concluded that plaintiff does not have an impairment or combination of impairments that meets or medically equals a listed impairment. (Tr. at 21.) The ALJ correctly observed that fibromyalgia is not a listed impairment and then performed a relatively detailed analysis concluding that plaintiff fails to meet or equal Listing 1.04 (disorders of the spine); Listing 11.14 (peripheral neuropathy); and Listing 12.04 (affective disorders). (Tr. at 21-22.) However, while conceding that she does not meet a listing, plaintiff asserts that the ALJ failed to properly consider whether plaintiff's combined impairments equaled a listing. See 20 C.F.R. § 404.1526(b)(3) ("If you have a combination of impairments, no one of which meets a listing...we will compare your findings with those for closely analogous listed impairments. If the findings related to your impairments are at least of equal medical significance to those of a listed impairment, we will find that your combination of impairments is medically equivalent to that listing.")

The Ninth Circuit held that, "in determining whether a claimant equals a listing under step three...the ALJ must explain adequately his evaluation of alternative tests and the combined effects of the impairments." Marcia v. Sullivan, 900 F.2d 172, 176 (9th Cir. 1990). Here, the ALJ did not expressly set forth any analysis regarding whether plaintiff's combined

---

[2] As the Ninth Circuit recognized, fibromyalgia is "a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue...Common symptoms...include chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue associated with this disease." Benecke v. Barnhart, 379 F.3d 587, 589-90 (9th Cir. 2004).

impairments equaled a listing.  Nevertheless, the Ninth Circuit has also made clear that a claimant must at least offer a theory with some supporting evidence that her combined impairments equal a listed impairment.  See Lewis v. Apfel, 236 F.3d 503, 514 (9th Cir. 2001).

Here, plaintiff has offered no actual theory of how her combined impairments equal a listing, nor did she cite any specific record evidence in support.  Plaintiff refers the court to a brief her counsel submitted to the ALJ prior to the hearing, which purportedly raised the issue of medical equivalence.  (Tr. at 211-14.)  However, it mostly consists of a general summary of medical evidence as opposed to evidence that is particularly keyed to specific listing requirements.  Furthermore, although plaintiff's counsel suggested that plaintiff's experience of chronic pain could "enhance" her lower back impairment under Listing 1.04 (disorder of the spine), "[a] finding of equivalence must be based on medical evidence only" and cannot be based on plaintiff's own symptom testimony.  Lewis, 236 F.3d at 514; 20 C.F.R. § 404.1529(d)(3) ("we will not substitute your allegations of pain or other symptoms for a missing or deficient sign or laboratory finding to raise the severity of your impairment(s) to that of a listed impairment").  Additionally, none of plaintiff's treating or examining providers opined that plaintiff's combined impairments medically equal a listing.  Finally, although plaintiff's counsel also suggested, in conclusory fashion, that plaintiff's impairments could equal Listing 12.07 for somatoform disorders, plaintiff entirely fails to point to any record evidence in support.

Accordingly, the ALJ did not err in concluding that plaintiff's combined impairments did not equal a listed impairment.  To the extent that the ALJ erred in failing to provide more detailed findings and analysis in this regard, the court finds that such error was harmless on the record before it.  See Curry v. Sullivan, 925 F.2d 1127, 1129 (9th Cir.1990) (harmless error analysis applicable in judicial review of social security cases).

\\\

\\\

\\\

(2) Whether the ALJ improperly evaluated the medical evidence in determining plaintiff's RFC

Plaintiff next contends that the ALJ improperly rejected the opinion of her treating physician Dr. Kevin Cheng and consultative examiner Dr. Shirley Wu regarding plaintiff's functional limitations.

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. Holohan v. Massanari, 246 F.3d 1195, 1201-02 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. Id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).

To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only for *"clear and convincing"* reasons. Lester, 81 F.3d at 830-31. In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for *"specific and legitimate"* reasons. Lester, 81 F.3d at 830. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (supported by different independent clinical findings), the ALJ may resolve the conflict. Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)). The regulations require the ALJ to weigh the contradicted treating physician opinion, Edlund v. Massanari, 253 F.3d 1152, 1157 (9th Cir.2001),[3] except that the ALJ in any event need not give it any weight if it is conclusory

---

[3] The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; and (6) specialization. 20 C.F.R. § 404.1527.

and supported by minimal clinical findings.  Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir.1999) (treating physician's conclusory, minimally supported opinion rejected); see also Magallanes, 881 F.2d at 751.  The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional.  Lester, 81 F.3d at 831.

In this case, there is no dispute as to plaintiff's diagnoses of fibromyalgia, degenerative disc disease/degenerative facet arthropathy, carpal tunnel syndrome, and depression.  Indeed, the ALJ found these to be severe impairments.  (Tr. at 20.)  Instead, the contradiction lies between the various physicians' opinions regarding plaintiff's functional limitations resulting from these impairments.

According to the medical records, plaintiff was first diagnosed with fibromyalgia and carpal tunnel syndrome in the early to mid 1990s, but continued working for many years as a paralegal until around May 1, 2007 when she felt that she was no longer able to continue with that work due to pain; difficulty with typing, keyboarding, and prolonged sitting and standing; and stress.  (Tr. at 40, 265, 268, 286-87, 342.)  She switched to doing some limited legal transcribing work from home, but found that it caused her even greater pain due to sitting and keyboarding for longer periods, and she ultimately stopped working entirely around early January 2008.  (Tr. at 40-42.)[4]

During 2007-2008, plaintiff was again diagnosed with fibromyalgia by both of her primary care providers, Dr. Ramandip Mangat and Dr. Mary Minguito, as well as rheumatologist Dr. Hui Pan, noting pain all over her body and tenderness at 13-14 trigger points (Tr. at 265-66, 268-69, 272-73, 338-39.)  November 5, 2007 x-rays of plaintiff's lumbar spine ordered by Dr. Pan showed minimal degenerative disc disease, but moderate to marked degenerative facet

---

[4] The ALJ found that the legal transcribing work plaintiff performed after her alleged onset date of May 1, 2007 was part-time and did not rise to the level of substantial gainful activity.  (Tr. at 20.)

8

disease from L4 through S1. (Tr. at 263.) After treatment with various medications, physical therapy, water walking, home exercises, paraffin hand/wrist wax treatment, and the use of a TENS unit,[3] Dr. Mangat referred plaintiff to Kaiser's chronic pain clinic on May 4, 2008. (Tr. at 276-78, 283-84, 336, 423-24.) On July 15, 2008, plaintiff was evaluated by Dr. Kevin Cheng with Kaiser's chronic pain management program. (Tr. at 342-44.) Plaintiff described whole-body pain with a range of 5-9 out of 10, which was worse at the end of the day and with stress, and was helped a little by medication and by physical therapy. (Tr. at 342.) On physical examination, Dr. Cheng found 14 out of 18 positive trigger points, decreased range of motion in her back, and tenderness in her knees and forearms, although she had a normal gait and strength. (Tr. at 343.) He also diagnosed plaintiff with fibromyalgia and increased her medications. (Tr. at 343.) Around that time, plaintiff started attending a pain management therapy group associated with Kaiser's chronic pain program. (Tr. at 408-18.)

On August 5, 2008, Dr. Minguito observed that plaintiff's pain was still not controlled although she was hoping to return to work in the future, and a physical examination revealed diffuse muscle tenderness, but no focal muscle weakness. (Tr. at 345.) Subsequently, on December 19, 2008, Dr. Minguito noted that plaintiff continues to follow up at the chronic pain clinic, but has reported gradual worsening of her symptoms over time, especially in her upper extremities, neck, and back. (Tr. at 405.) Dr. Minguito stated that plaintiff had tried several medications without much improvement – her medications helped alleviate her pain, but also caused her drowsiness. (Tr. at 405.) A physical examination again revealed a normal gait, but muscle tenderness at several trigger points. (Tr. at 405.)

On November 14, 2008, Dr. Cheng completed a chronic pain residual functional capacity questionnaire, identifying plaintiff's symptoms resulting from her fibromyalgia as

---

[3] "Transcutaneous electrical nerve stimulation (TENS), used to treat some types of chronic pain, sends pulses of battery-generated electrical current to key points on a nerve pathway via electrodes taped to your skin." See http://www.mayoclinic.com/health/medical/IM01523.

1  generalized pain in all four quadrants of the body, fatigue, and stress.  (Tr. at 384.)  He listed his
2  objective findings as trigger points, tenderness, impaired sleep, muscle spasms, sensory changes,
3  and reduced range of motion in the arms, hands, elbow, hips, and knees.  (Tr. at 384.)  He noted
4  that plaintiff experienced drowsiness and constipation as side effects of her medications.  (Tr. at
5  385.)  Dr. Cheng opined that plaintiff could walk 2-3 blocks without rest or severe pain; could sit
6  for 30 minutes at a time; could stand for 30 minutes at a time; could sit, stand, and walk for less
7  than two hours total in an eight-hour workday; and would need to lie down at unpredictable
8  intervals 2-3 times during an eight-hour workday.  (Tr. at 385-86.)  He further stated that plaintiff
9  could occasionally lift up to 10 pounds and rarely lift up to 20 pounds; could occasionally twist,
10 stoop/bend, and climb stairs, but rarely crouch/squat or climb ladders; and could use her arms,
11 hands, and fingers for reaching, grasping, turning, twisting, and fine manipulation about 25% of
12 an eight-hour workday.  (Tr. at 386.)  He also estimated that plaintiff would likely be absent from
13 work about four days per month as a result of her impairments and treatment of her impairments,
14 and opined that she could perform sedentary work for about 15 hours a week on a regular basis.
15 (Tr. at 387.)  Dr. Cheng indicated that plaintiff's impairments lasted or could be expected to last
16 at least 12 months.  (Tr. at 385.)

17         There can be little doubt that if Dr. Cheng's assessment were fully credited,
18 plaintiff would be disabled under the Act.  The ALJ discounted the relevant portion of Dr.
19 Cheng's opinion as follows:

> Treating source Kevin Cheng, D.O., completed a medical source
> statement in November 2008 at the request of the claimant's
> representative (Ex. 17F).  Dr. Cheng assessed that the claimant
> could engage in less than sedentary activity (Ex. 17F, pp. 3-6).
> Reduced weight is given to Dr. Cheng's assessment in light of the
> claimant's overall and minimal treatment.  The record reflects that
> the claimant has been treated for fibromyalgia symptoms but she
> has been seen on a limited basis and she has reported benefit from
> therapy, medications and other conservative alternative modalities.
> She also continues to engage in a variety of activities that suggest
> that she is not wholly disabled, as noted above.  While Dr. Cheng
> simply states that the claimant has generalized pain consistent with
> fibromyalgia, his assessment report is not well-corroborated by

10

> objective medical findings, as required by 20 CFR 404.1527(d)(2). The treatment notes fail to document a persistent pattern of joint symptoms and she has exhibited full range of motion, normal gait and no synovitis at times (Exhibits 2F, 10F, 18F).

(Tr. at 25-26.)

The ALJ's conclusion that plaintiff received "minimal" or "limited" treatment is not supported by substantial evidence in the record as a whole. As outlined above, plaintiff sought treatment from two primary care providers, a rheumatologist, a chronic pain specialist, and a physical therapist for her impairments and followed their prescribed treatment. Although the record did not contain extensive medical records from 2009 onwards, plaintiff testified that she continued to do her home exercise therapy program (explaining that her physical therapist indicated that there was not much more he could do other than check on her exercises), continued to participate in chronic pain program classes, and continued to take her medications which stabilized her pain limit sufficiently to allow her to get up and move around. (Tr. at 43-45.)

Furthermore, although plaintiff did report some improvement with physical therapy and medication, the medical records also show that plaintiff's medication often did not sufficiently control her pain, and that her doctors were continuously switching and increasing her medication to attempt to find therapeutic levels, which in turn caused significant side effects of sleepiness and drowsiness. (See e.g. tr. at 58-60, 273, 281, 338-39, 343, 345, 405, 421.) At the hearing she testified that the medications brought her pain down from about an 8.5 to 9 to about a 6 to 7 on a 10-point scale, but that the muscle relaxant she took about 3-4 times a day made her sleep and rendered her unable to drive. (Tr. at 45-47.) As plaintiff put it: "If I take the medication I can't do the work, if I don't take the medication I can't do the work, and so I don't know how to fully describe it other than I cannot function at the level that I used to function at, no matter how hard I try." (Tr. at 61.)

Additionally, the ALJ suggested that plaintiff's level of activities also undermined Dr. Cheng's opinion. The ALJ stated that plaintiff was able to walk for exercise, garden, engage

11

in activities such as driving and running errands outside the house, visit with friends and check in on her mother and another elderly woman, maintain her personal hygiene on a daily basis, transport her child to school and back home, care for and play with her dog, prepare at least simple meals, engage in housework, shop for clothes and groceries, and drive four to five days per week. (Tr. at 23-24.)

However, a careful review of the record reveals that the ALJ's summary significantly overstated plaintiff's level of activity. While plaintiff admitted to engaging in those types of activities, they were typically undertaken at a slow pace with many breaks and did not consume a substantial part of her day. (Tr. at 51, 54-57.) For example, she testified to trying to do something every day, such as driving to the store or pharmacy to pick something up. (Tr. at 56.) Afternoons she helped her mother by going through mail, playing with and washing the dog, and helped another elderly woman by combing her hair and spending time talking to her. (Tr. at 55.) Her gardening essentially involved watering a flower basket garden at her apartment. (Tr. at 55-56.) She also described limited walking to the park down the street and to the farmer's market, and she was very proud of having walked one lap around the track at a Relay for Life event. (Tr. at 51.) With respect to household chores, she stated:

> The laundry, yeah I do, but I've found – and this is again part of what I've learned through chronic pain – is pacing it. If I do one load of laundry every four days as opposed to trying to do four loads in one day, I can get through a week. So vacuuming, not more than once a week because that is definitely pain. Same with any type of sweeping. Doing dishes – I do do the dishes but I drop them a lot, break them.

(Tr. at 56.) Although the ALJ observed that plaintiff described a "full range of daily activities" to consultative examiner Dr. Wu, she actually informed Dr. Wu that while she was able to drive, cook, vacuum, and do dishes at home, she required frequent breaks to finish the activities and was not able to do yard work. (Tr. at 24, 287.) This is consistent with plaintiff's statement to consulting psychologist Dr. Wendy McCray that she "must break tasks down into small segments and complete them over time." (Tr. at 297.) Finally, even though the ALJ noted that plaintiff

had taken care of her father, mother, son, and stepsons to some extent in January 2007, this was prior to the alleged disability onset date, plaintiff at that time told her therapist that she was unable to continue doing it, and it was evident that plaintiff was not coping well.  (Tr. at 24, 259.)

The Ninth Circuit has "repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities ... does not in any way detract from her credibility as to her overall disability.  One does not need to be utterly incapacitated in order to be disabled." Benecke, 379 F.3d at 594 (internal quotation omitted).  For this same reason, plaintiff's relatively limited daily activities, undertaken with significant pacing and breaks, do not constitute a legitimate reason to reject Dr. Cheng's assessment.

With respect to the ALJ's finding that Dr. Cheng's opinion is "not well-corroborated by objective medical findings," the Ninth Circuit has recognized that although the American College of Rheumatology issued a set of diagnostic criteria for fibromyalgia, "there are no laboratory tests to confirm the diagnosis."  Benecke, 379 F.3d at 590.  Diagnosis of the disease, along with an accurate assessment of associated functional limitations, is therefore necessarily dependent on the clinical findings, expertise, and experience of the physician. Although Dr. Cheng himself did not appear to examine and treat plaintiff extensively, the court cannot say that his opinion is conclusory or minimally supported, and his diagnosis and assessment are relatively consistent with the clinical findings of plaintiff's primary care providers, Drs. Mangat and Minguito, and rheumatologist Dr. Pan.  Moreover, with special expertise in chronic pain management, Dr. Cheng's opinion carries substantial weight.

Moreover, even if the court were to find that the relatively severe limitations imposed by Dr. Cheng were not adequately supported by his clinical findings, the opinion of consultative examiner Dr. Shirley Wu also suggests that plaintiff is disabled under the Act.  (Tr. at 286-90.)  After a physical examination on April 26, 2008, Dr. Wu opined that plaintiff could do light work, but that she would need to take breaks every hour for ten minutes to accommodate fatigue and stiffness.  (Tr. at 289.)  The VE testified that such a limitation would prevent plaintiff

13

from obtaining substantial gainful employment. (Tr. at 66.) Even though the ALJ credited most of Dr. Wu's opinion, he gave little weight to her assessment that plaintiff would require such hourly breaks, indicating that it was not well supported and based on limited objective findings. (Tr. at 24.) Relying primarily on the opinions of non-examining state agency consultants, Drs. Eskander and Sciara, the ALJ reasoned that "Dr. Wu's own physical examination of the claimant was generally unremarkable and she observed adequate gait, normal motor function in the lower extremities and negative straight leg raise." (Tr. at 24-25, 291-95, 352-59.)

As an initial matter, the opinions of a non-examining professionals, without other evidence, are insufficient to reject the opinion of a treating or examining professional. Lester, 81 F.3d at 831. Here, the ALJ relied on the opinions of the non-examining state agency consultants, who offered no additional independent clinical findings, to reject pertinent portions of the treating and examining physicians' assessments. Furthermore, the fact that Dr. Wu's examination revealed that plaintiff had a normal gait, normal motor function, mostly normal range of motion, and was able to walk and sit without difficulty during the one-time examination does not necessarily undermine plaintiff's persistent symptoms of pain, stiffness, and fatigue associated with her fibromyalgia and other impairments. It is also not surprising that plaintiff did not have significant atrophy, given that she was maintaining some level of activity and exercises. While defendant suggests that Dr. Wu relied entirely on plaintiff's subjective complaints in formulating the hourly breaks limitation, Dr. Wu was the Commissioner's designated consultative examiner and presumably had the requisite clinical expertise to properly assess plaintiff's limitations based on her examination, clinical findings, and plaintiff's reported symptoms. Dr. Wu's finding that plaintiff would require regular breaks is also consistent with treating physician Dr. Cheng's similar opinion.

For these reasons, the court finds that the ALJ failed to provide specific and legitimate reasons to reject the opinions of Drs. Cheng and Wu and therefore improperly evaluated the medical evidence in formulating plaintiff's RFC.

1        (3) Whether the ALJ improperly discredited plaintiff's testimony concerning her
2 symptoms and associated functional limitations

3        "Credibility determinations are the province of the ALJ" and are entitled to
4 deference if the ALJ provides sufficient reasoning supported by substantial evidence. Fair v.
5 Bowen, 885 F.2d 597, 604 (9th Cir. 1989). A two-step analysis is used to determine whether a
6 claimant's testimony regarding subjective pain or symptoms, and resulting functional limitations,
7 is credible. First, the claimant "must produce objective medical evidence of an underlying
8 impairment which could reasonably be expected to produce the pain or other symptoms
9 alleged...." Smolen, 80 F.3d at 1281 (citations omitted). "[T]he claimant need not show that her
10 impairment could reasonably be expected to cause the severity of the symptom she has alleged;
11 she need only show that it could reasonably have caused some degree of the symptom." Id. at
12 1282. Second, once this initial showing is made and there is no affirmative evidence of
13 malingering, "the ALJ may reject the claimant's testimony regarding the severity of her
14 symptoms only if he makes specific findings stating clear and convincing reasons for doing so."
15 Id. at 1283-84; see also Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009).

16        "General findings are insufficient; rather, the ALJ must identify what testimony is
17 not credible and what evidence undermines the claimant's complaints." Lester, 81 F.3d at 834;
18 see also Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). In weighing a claimant's
19 credibility, the ALJ may consider, among other factors, her reputation for truthfulness;
20 inconsistencies in her statements and testimony, or between her statements or testimony and her
21 conduct; her daily activities; her work record; unexplained or inadequately explained failure to
22 seek treatment or to follow a prescribed course of treatment; and testimony from physicians and
23 third parties concerning the nature, onset, duration, frequency, severity, and effect of the
24 symptoms of which she complains. See Smolen, 80 F.3d at 1284. However, the ALJ may not
25 find subjective complaints incredible solely because objective medical evidence does not
26 quantify them. Bunnell v. Sullivan, 947 F.2d 341, 345-46 (9th Cir. 1991).

In this case, the ALJ primarily discredited plaintiff's testimony by referencing her daily activities and supposedly effective treatment with physical therapy and medication. (Tr. at 23-24.) However, for the reasons discussed above, the ALJ's conclusions regarding plaintiff's activity level and the efficacy of her treatment are not supported by substantial evidence in the record as a whole and thus cannot serve as clear and convincing reasons for discounting plaintiff's testimony. Additionally, the fact that she was able to answer questions "without difficulty or loss of concentration" during the course of a hearing that lasted less than an hour is not by itself dispositive. (Tr. at 24, 35, 70.) Finally, the ALJ's observation that plaintiff "continued to work as a paralegal for many years despite a history of discomfort due to fibromyalgia, back pain, and carpal tunnel syndrome" is not a clear and convincing reason for rejecting plaintiff's testimony. As outlined above, there was significant medical evidence that plaintiff's symptoms worsened over time. Under such circumstances, a claimant should not be penalized for attempting to work for as long as she was able. In many cases, this point of struggling over time despite a fibromyalgia diagnosis proves the claimed pain and symptoms more than a suspicious, immediate change from doing well to completely unable to work.

Therefore, the court also concludes that the ALJ failed to provide specific, clear, and convincing reasons for rejecting plaintiff's testimony regarding the severity of her symptoms and associated limitations.

### (4) Other Issues

In light of the ALJ's errors in evaluating the medical opinion evidence and discounting plaintiff's testimony regarding the extent of her symptoms and functional limitations, the court finds it unnecessary to reach plaintiff's remaining arguments. The only issue is whether the case should be remanded for additional evidence or an award of benefits. Where the ALJ fails to provide adequate reasons for rejecting the opinion of a treating physician, the opinion is credited as a matter of law. Lester, 81 F.3d at 834. Similarly, where the ALJ improperly rejects the claimant's testimony regarding her limitations and the claimant would be disabled if her

testimony were credited, that testimony is credited as a matter of law.  Id.   There appears to be a split in Ninth Circuit authority as to whether the "credit as true" rule is mandatory or discretionary.  Vasquez v. Astrue, 572 F.3d 586, 593 (9th Cir. 2009).

However, in this case, the court has little difficulty in concluding that the "credit as true" rule should be applied and the case remanded for benefits.  An award of benefits is appropriate where "no useful purpose would be served by further administrative proceedings" and "the record has been thoroughly developed."  Varney v. Sec'y of Health & Human Servs., 859 F.2d 1396, 1399 (9th Cir. 1988).  This is a recognition of the "need to expedite disability claims."  Id. at 1401.  Here, the record has been fully developed and there is no need for an additional consultative evaluation, clarification from plaintiff's treating physicians, or supplemental VE testimony.  For the reasons discussed above, if the opinions of treating physician Dr. Cheng and consultative examiner Dr. Wu were properly credited, plaintiff would be found disabled under the Act.  Remand for an award of benefits, with a disability onset date of May 1, 2007, is therefore appropriate.

CONCLUSION

Accordingly, for the reasons outlined above, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment (dkt. no. 16) is GRANTED;

2. Defendant's cross-motion for summary judgment (dkt. no. 18) is DENIED;

3. The case is remanded to the Commissioner for payment of benefits; and

4. Judgment is entered for plaintiff pursuant to sentence four of 42 U.S.C. § 405(g).

DATED: August 23, 2012

/s/ Gregory G. Hollows
UNITED STATES MAGISTRATE JUDGE

GGH/wvr
Martin.891.ss.wpd